Anna M. Barvir (Bar No. 268728)
ABarvir@michellawyers.com
Joshua Robert Dale (Bar No. 209942)
JDale@michellawyers.com
Michel & Associates, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
562-216-4444

*Local Counsel for Plaintiff*

Marie Miller* (IN Bar No. 34591-53)
mmiller@ij.org
INSTITUTE FOR JUSTICE
3200 N. Central Ave., Ste. 2160
Phoenix, AZ 85012
480-557-8300

Patrick Jaicomo* (MI Bar No. P-75705)
pjaicomo@ij.org
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, VA 22203
703-682-9320

* ~~Applications for admission~~Admitted pro hac vice ~~forthcoming~~

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| George Retes, Jr.,<br><br>            *Plaintiff*,<br>      v.<br><br>United States of America; and DOES 1 through 10, Unknown Officers of the Federal Bureau of Prisons, United States Immigration and Customs Enforcement, the United States Navy, the Federal Bureau of Investigation, and United States Customs and Border Protection,<br><br>            *Defendants*. | Case No.: <u>2:26-cv-01761-JAK-AYP</u><br><br>**<u>FIRST AMENDED</u> COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |

**INTRODUCTION**

1.    This is a civil-rights lawsuit arising from federal officers' unlawful detention of an innocent United States citizen.

2.    One afternoon last July, 2025, George Retes, Jr.—an Army combat veteran, father, and security guard—was trying to report to his scheduled shift at a farm in Camarillo, California.

3.    Unbeknownst to George, though, federal officers were conducting an immigration raid at the farm. Workers were being rounded up. Family members, journalists, and bystanders had gathered on the road leading to the farm. The scene was tense but nonviolent.

4.    As George slowly drove on the road leading to the farm, he encountered a line of federal officers blocking his path. Calm and compliant, George explained that he was a U.S. citizen and that he worked at the facility; he was trying to get to work. He was not protesting. He was not interfering with law enforcement. And he was not threatening anyone.

5.    The officers, for their part, showed no interest in confirming George's story. No officer suggested that he had broken any law, either. And no officer perceived him as a threat.

6.    Instead of letting him pass, some officers ordered George to leave. Others ordered him to get out of his car. George tried to comply with the conflicting commands. But the officers engulfed his vehicle in tear gas, pounded on his window until it shattered, sprayed George with pepper spray, dragged him from his car, and threw him to the ground.

7.    George did not resist. Using his military training to stay calm, he voluntarily placed his arms behind his back to show compliance. Still, officers knelt on his back and neck, zip-tied his hands, and detained him for hours at the farm—without ever telling him what he was accused of.

2

First Amended Complaint for
Declaratory Relief and Damages

8. That was only the beginning of the ordeal. Federal officers transported George to a Navy base, where they fingerprinted him, photographed him, shackled him, and took a DNA sample—all without a warrant, probable cause, or any legitimate explanation. George was denied access to a phone and was not allowed to wash the chemicals off his burning skin.

9. That evening, federal officers transferred George to the Metropolitan Detention Center in Los Angeles. There, he was strip searched, deprived of his belongings, and held incommunicado for three days and three nights. He was never brought before a judge and was never charged with any offense.

10. Over the three days (approximately 72 hours) he spent in custody, he was deprived of basic rights that even suspected criminals receive. He was not allowed a phone call, access to counsel, or a hearing. He was also subjected to inhumane treatment, not being allowed a shower to wash chemical irritants off his body.

11. George missed work, lost professional standing with his employer, and missed his daughter's third birthday party. The traumatic experience exacerbated injuries he had sustained during his military service. And throughout his detention, no federal officer could provide an answer to the simplest question: *Why am I here?*

12. George brings this case seeking accountability for his unconstitutional and tortious treatment by federal officers. This complaint lays out several pathways for relief.

13. For the federal constitutional violations and for the torts he suffered, George asserts the following:

    a.   state-law claims under California's Tom Bane Civil Rights Act (Count 1) and traditional torts (Counts 2–5), for violations of George's Fourth and Fifth Amendment rights, under two alternative theories:

3

First Amended Complaint for
Declaratory Relief and Damages

  i. either those state-law claims are available under the Westfall Act, 28 U.S.C. § 2679(b)(2)(A), as traditional remedies for constitutional violations by federal officers; or

  ii. if the Westfall Act is held to preclude those claims, and no other remedy is available to George, the Westfall Act is unconstitutional as applied to him, and whatever barrier the Act poses to his state-law claims is invalid and ineffective;.

b. constitutional claims directly under the Fourth and Fifth Amendments for violations of George's constitutional rights (Count 6);

c. claims under the Westfall Act, which codified *Bivens* as it existed in 1988, for the violations of George's constitutional rights (Count 7); and

d. claims against the United States government under the Federal Tort Claims Act for the wrongful acts and omissions of the government's employees with the Federal Bureau of Prisons, United States Immigration and Customs Enforcement, the United States Navy, the Federal Bureau of Investigation, and United States Customs and Border Protection (Count 8).

14. Before asserting his claims under the Federal Tort Claims Act, George anticipates adding other claims against the United States under the Federal Tort Claims Act for the wrongful acts and omissions of the other federal officers responsible for George's unlawful treatment. Those claims are the subject of pendingexhausted his administrative claims with the Federal Bureau of Prisons; the Department of Homeland Security, including Customs and Border Protection and Immigration and Customs Enforcement; the Federal Bureau of Investigation; and the Navy.

4

First Amended Complaint for
Declaratory Relief and Damages

15. At base, a central promise of our justice system is that innocent people like George are entitled to be free from arbitrary imprisonment, and inhumane conditions at the hands of federal agents. *See Noem v. Perdomo*, 146 S. Ct. 1, 5 (2025) (Kavanaugh, J., concurring) ("To the extent that excessive force has been used, the Fourth Amendment prohibits such action, and remedies should be available in federal court."). Whatever path the Court ultimately selects, George is entitled to be made whole.

## JURISDICTION AND VENUE

16. Plaintiff George Retes, Jr., brings this case under the Fourth and Fifth Amendments to the Constitution of the United States; the Federal Tort Claims Act and the Westfall Act of 1988, 28 U.S.C. §§ 1346, 2674 *et seq.*; and California law.

17. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367 because George asserts claims under federal laws and his state-law claims seek to remedy constitutional violations and arise from the same underlying events.

18. Venue is proper under 28 U.S.C. §§ 84(c)(2), 1391(b)(2), and 1402(b) because the events giving rise to this action occurred in Ventura and Los Angeles counties.

## PARTIES

19. Plaintiff George Retes, Jr., is a citizen of the United States.

20. When the underlying events occurred, George resided in Ventura, California, where he continues to reside.

21. Defendant United States of America is the government of the United States.

22. Defendants named as DOES 1 through 10, inclusive, are unknown officers of the Federal Bureau of Prisons, United States Immigration and Customs Enforcement, the United States Navy, the Federal Bureau of Investigation, and United States Customs and Border Protection and are, or at least were at the time

5

First Amended Complaint for
Declaratory Relief and Damages

of the underlying events, employees of the United States government. During the underlying events, the officers subjected George, or caused him to be subjected, to the deprivation of his constitutional rights and his rights under California law. At all relevant times, they were acting within the scope of their employment. They include officers depicted in the photos in the allegations below. They are sued in their individual capacities.[1]

## FACTUAL ALLEGATIONS

### A. Federal officers violently detain George.

23.    Shortly after 2 p.m. on Thursday, July 10, 2025, Plaintiff George Retes, Jr. headed from home to work from home.

24.    It was a warm, sunny day in Ventura, California, George's birthplace and current home.

25.    His uniform was in the car, ready to be worn at the start of his shift.

26.    Now he wore gym shorts and Crocs on his feet.

27.    Over a T-shirt he wore his favorite sweatshirt—one from the first unit to which he was assigned in the Army: Echo Troop, 5th Squadron, 1st Cavalry Regiment.

28.    He had gotten the sweatshirt while based at Fort Wainwright, Alaska.

29.    The front bore the unit's "Hellcats" logo, along with "ECHO TROOP" and "5-1 CAV."

30.    The back displayed a larger logo with "HELLCATS" and "HEAVY WEAPONS."

31.    Departing for work, George got into his white Hyundai Elantra, which also signaled his background as an Army combat veteran.

---

[1] George has tried to learn these Defendants' identities through public records requests to the federal agencies. The agencies have not disclosed the officers' identities.

6

First Amended Complaint for
Declaratory Relief and Damages

32. His license plate said, "COMBAT INFANTRYMAN BADGE" and "DISABLED VETERAN U.S. ARMED FORCES."

33. A decal on the back window said, "IRAQ COMBAT VETERAN."

34. George was not in the military anymore.

35. Serving a tour in Kirkuk, Iraq, during rocket attacks by Iran-backed militias had taken a physical and emotional toll on him.

36. He also wanted to spend more time with his kids.

37. So he was honorably discharged in 2022.

38. Now George drove his usual route to work as a security guard.

39. His employer was the national security-services contractor Securitas.

40. Securitas assigned George to work at a licensed marijuana-growing facility, Glass House Farms, in Camarillo, California.

41. There he manned a guard shack, letting employees and invitees onto the property and keeping trespassers out.

42. Normally George worked night shifts, but for July 10, he had finally gotten the shift he had long been asking for: an afternoon-to-evening shift.

43. But as he drove closer to the farm, he discovered that something was out of the ordinary.

44. On the single road leading to the farm's entrance, cars were backed up and pedestrians were walking and standing around.

45. Unbeknownst to George, an immigration-enforcement raid was happening at Glass House Farms.

46. Federal law-enforcement officers were rounding up workers suspected of illegal immigration.

47. Family members, protesters, and journalists had gathered on the road leading to the farm.

48. None of them were behaving violently.

First Amended Complaint for
Declaratory Relief and Damages

49.    George slowly navigated through the traffic until, at about 2:25 p.m., he encountered a row of federal officers standing across the road, blocking his path to work.

50.    He showed no signs of guilt for any crimes, immigration or otherwise.

51.    Indeed, he did not flee at the sight of law enforcement.

52.    He did not appear scared or nervous.

53.    Nor was he boisterous or belligerent.

54.    He was not protesting.

55.    He did not make any threatening or dangerous maneuvers with his vehicle.

56.    He did not make any combative gestures or remarks.

57.    He did not even honk his horn.

58.    His wallet with his driver's license was in the vehicle, along with his phone.

59.    He calmly exited his vehicle and stood next to it.

60.    He had nothing in his hands.

61.    He was clearly unarmed.

62.    George's body language and words showed he was calm and on a singular mission to get to work—to be on time for a shift he had finally been assigned.

63.    He stayed about a car's length away from the line of officers: far enough to show caution and a lack of interest in harming anyone or interfering with their operations, but close enough to converse with them.

64.    He explained to the officers that he is a U.S. citizen, was not a protester, and was simply trying to get to work at the farm, where he works as a security guard.

8

First Amended Complaint for
Declaratory Relief and Damages

65. No officer showed any interest in confirming that George was (or wasn't) who he said he was.

66. No officer suggested that George had violated any laws.

67. No officer suggested that George was suspected of any crime, any immigration violation, any violent act, or any protest activity.

68. But they did not let him pass to get to work.

69. Instead, they told him that "work is closed today" and to go home.

70. George knew that if he didn't show up to his shift, he could lose pay and his good reputation with his employer. He also would not get this desired shift again.

71. But as the row of officers started walking forward, toward George, the protesters, and others, George figured that it was not worth trying to get to work anymore.

72. George got back into his car and slowly backed it up and moved it to another part of the road, out of the way of a line of armored vehicles and buses that were leaving the farm.

73. Once that row of vehicles passed, officers gave George conflicting orders.

74. Some said to get out of the vehicle.

75. Some said to back up the vehicle.

76. Trying to comply and avoid hitting the officers or anyone else, George slowly backed the vehicle up.

77. Officers then deployed tear-gas canisters on the road behind George's vehicle, between his vehicle and the protesters and others.

78. As George continued to slowly back up, his car was engulfed in clouds of tear gas.

79. He could no longer see, and it was hard for him to breathe.

80. Unable to safely maneuver his car, he stopped it.

9

First Amended Complaint for
Declaratory Relief and Damages

81.   One or more officers pounded on George's driver's side window with a firearm.

82.   George explained to the officers, "I'm trying to leave."

83.   Still, an officer shattered the window, showering George with glass.

84.   Some of the glass shards cut one of his exposed thighs.

85.   One officer reached through where the window had been and sprayed George's face and body with pepper spray.

86.   Another pulled George out of the vehicle and violently threw him to the ground, coughing and bleeding, his skin burning from chemical irritants:



87.   No officer gave George a less violent option.

88.   George was clearly nonthreatening and was clearly not part of the protest, which itself was nonviolent.

89.   Using his military training to stay calm, George did not resist the officers; he knew it would only make things worse.

10

First Amended Complaint for
Declaratory Relief and Damages

90.    Lying on his stomach, he voluntarily put his arms behind his back to show that he was cooperating and was not a threat:



91.    Still, next an officer knelt on George's back.

92.    Another officer put a knee on George's neck.

93.    Officers soon pulled George up off the ground and zip-tied his hands behind his back.

94.    At no time did any officer hint that George was suspected of any crime.

95.    Officers walked George to the farm and ordered him to sit on the dirt.

96.    George was separated from detainees whom officers suspected of immigration offenses.

97.    He sat in his place in the dirt, near two other citizen-detainees, for about four hours with his hands zip-tied.

98.    During this time, an officer asked George if he had his wallet with

First Amended Complaint for
Declaratory Relief and Damages

him.

99.   George explained that it was in the center console of his vehicle.

100.   Nobody retrieved or inspected his wallet or driver's license.

101.   George also explained again to officers that he is a U.S. citizen, was not protesting, and was simply trying to get to work.

102.   He also reiterated that he is a veteran and that he ~~had~~ worked as a security guard at the farm.

103.   He repeatedly asked officers why he was being detained.

104.   Nobody answered George's question.

105.   Nobody seemed to know.

106.   He also heard officers asking one another why George had been arrested.

107.   Nobody had any answers.

108.   Officers at the farm included or may have included agents from Immigration and Customs Enforcement, the Federal Bureau of Investigation, ~~and~~ Customs and Border Protection, or other federal agencies.

109.   George figured he would be released from the farm at any moment, because he was aware of no crime he could be suspected of committing.

110.   He was wrong about being promptly released.

**B. George is transported to a Navy base and searched.**

111.   Federal officers next moved George into an unmarked SUV, hands still zip-tied.

112.   Officers placed another detained U.S. citizen in the same SUV.

113.   Two officers were in there, too.

114.   One drove the vehicle to Port Hueneme.

115.   There, officers took George's fingerprints, photographed him, exchanged the zip ties for handcuffs and leg shackles, and swabbed his cheek for a DNA sample.

12

First Amended Complaint for
Declaratory Relief and Damages

116. The officers at the base included those from the U.S. Navy, the Department of Homeland Security, and the Federal Bureau of Investigation.

117. One officer gave George warnings about certain rights, though George was never told that he was suspected or accused of any crime.

118. ~~He~~ The officer also asked George why ICE agents had detained George.

119. George replied that he didn't know and would like to learn the answer to that question, too.

120. While detained at the base, George asked officers if he could make a phone call and talk with an attorney.

121. George had put his phone in his pocket before officers dragged him from his car, but he could not access it because his hands were first zip-tied and then handcuffed.

122. He also asked why he was being detained and when he would be released.

123. He also asked to wash the chemical irritants off his body.

124. Nobody answered George's questions, and he was not allowed to make a phone call, contact an attorney, or clean his skin.

**C. George is transported again and detained for three days and nights.**

125. Later in the evening, federal officers transported George to the federal Metropolitan Detention Center in Los Angeles.

126. The detention center is part of and controlled by the Federal Bureau of Prisons.

127. This time, no other detainees were in the transport vehicle with him.

128. He arrived between 9 and 10 p.m.

129. His personal belongings were taken from him: his clothes, phone, a watch, and jewelry.

130. He was strip-searched, fingerprinted, photographed, and given jail

13

First Amended Complaint for
Declaratory Relief and Damages

garb to wear.

131.    He kept asking officers or personnel at the facility why he was being detained, when he would be released, and whether he could make a phone call and talk with an attorney.

132.    He also explained that his daughter's third birthday party would be on Saturday, and it was really important for him to be there.

133.    He also explained that he hadn't been given a phone call yet.

134.    He was given no answers.

135.    He was not allowed to make a phone call, speak with an attorney, see a judge, or take a shower.

136.    The tear gas and pepper spray kept burning his skin.

137.    That night, he tried to relieve the pain with resourcefulness: he put water in sandwich bags given to him with his meal of sandwiches, then soaked his hands in that water.

138.    But it didn't help; in fact, it only seemed to worsen the pain.

139.    Wherever his body touched anything, it felt like it was on fire.

140.    He hardly slept that night, in pain and distress about being locked up inexplicably, with no ability to contact the outside world.

141.    The next morning (Friday), George underwent medical screening and a psychological evaluation.

142.    He was distressed about being locked up for no good reason, having no idea whether or when he would be released, and feeling entirely cut off from the outside world, with his daughter's birthday party the next day.

143.    As a result of the psychological evaluation, George was placed on suicide watch.

144.    That meant he was clothed in only a garment resembling a hospital gown, he was given only a thin mattress, a guard remained nearby, and the lights remained on around the clock.

14

First Amended Complaint for
Declaratory Relief and Damages

145. George kept asking why he was detained and asked to make a phone call and talk with an attorney.

146. He continued to get the same nonresponse.

147. On information and belief, the officials who continued to detain George knew or should have known that no allegations of criminal wrongdoing supported his detention.

148. He was not presented to any judge for a hearing.

149. He was not given a phone call.

150. He was not allowed to shower.

151. He was completely incommunicado with anyone outside the detention facility.

152. Nothing at the facility made it physically impossible or unreasonably impractical to allow George to make a phone call, to be presented to a judge for a hearing, or to take a shower.

153. Nothing changed from those conditions for the next day (Saturday).

154. Still no hearing with a judge, no shower, no phone call, no ability to contact an attorney.

155. George's family was frantically searching for him.

156. His wife, mom, and aunt cried out to anyone who would listen and help.

157. A farm-labor union, United Farm Workers, discovered that George was being held at the Metropolitan Detention Center.

158. On Sunday morning (the third day of George's detention), the union started reaching out to media outlets and scheduled a press conference for Monday morning in front of the Metropolitan Detention Center, with George's family planning to attend.

159. The Associated Press, Washington Post, and Los Angeles Times asked the Metropolitan Detention Center and/or Department of Homeland

15

First Amended Complaint for
Declaratory Relief and Damages

Security about George's detention and the planned press conference.

160. On Sunday afternoon, an officer told George he was going to be off suicide watch and would be released.

161. That same afternoon, he was escorted downstairs.

162. He was given his belongings and documents that say, "CBP Form 6051D" and "Department of Homeland Security U.S. Customs and Border Protection Detention Notice and Custody Receipt for Detained Property."

163. The documents listed the "reason for detention" as simply "detained pursuant to arrest."

164. George was told there were no charges against him.

165. George asked: "So I was kept here for three days and missed my daughter's birthday for nothing?"

166. He received no response.

167. For George, it was the loudest silence he had ever heard.

168. George was then released.

169. He called his wife, who picked him up and took him home to the rest of his family, where he took a shower and hugged his kids with overwhelming relief.

**D. George submits exhausts administrative claims and requests records requests.**

170. Between August 17, 2025, and October 8, 2025, In the weeks and months following his detention, administrative claims from George submitted administrative claims and records requests about the underlying events to the agencies involved:were received by the Department of Homeland Security, including Immigration and Customs Enforcement and Customs and Border Protection; the Federal Bureau of Prisons; the Federal Bureau of Investigation; and the Department of the Navy.

170.171. Also after his detention, George and his representatives submitted

16

First Amended Complaint for
Declaratory Relief and Damages

records requests to these agencies, seeking information about the officers involved in the underlying events and other documents concerning the underlying facts.

172. On August 22, 2025, the Federal Bureau of Prisons mailed George's representative a response to his administrative claim, which stated that the Bureau was "referring the claim . . . to the United States Immigration and Customs Enforcement since it appears the activities of this agency gave rise to the allegations."[2]

173. In a letter dated March 24, 2026, U.S. Customs and Border Protection notified George's representative that the administrative claim with that agency "was deemed denied by February 17, 2026" and that "should you choose to file a subsequent suit in this matter, it must be filed in the appropriate United States District Court no later than six (6) months after the date of this letter."

171.174. No other agencies purported to finally resolve George's respective administrative claims. Because the agencies did not finally dispose of his claims within six months after their submission, George deems those failures as final denials.

172.175. The agencies have produced no records that George or his representatives requested.

### INJURY TO PLAINTIFF

173.176. During the whole ordeal, George experienced traumatic physical and psychological abuse.

174.177. He was handcuffed, shackled, transported, searched, treated like a violent criminal, deprived of a shower to wash off chemical irritants, and denied basic civil rights.

---

[2] George's administrative claims with the other agencies remain pending. If those agencies deny his claims, he anticipates amending his complaint to add additional claims against the United States under the Federal Tort Claims Act   claims of tortious conduct by the John Does who do not work in the Federal Bureau of Prisons.

First Amended Complaint for
Declaratory Relief and Damages

175.178.  He was deprived of his personal property while detained.

176.179.  He was jailed for three days and three nights without legitimate reasons and without explanation.

177.180.  He was deprived of a hearing with a judge.

178.181.  He was deprived of access to an attorney.

179.182.  Had he been given a hearing within 48 hours of his detention, he would have been released at least one day earlier and would have gotten to wash off the chemicals from his body at least one day sooner.

180.183.  He was not allowed to call anyone—his family, friends, an attorney, or his boss.

181.184.  Being entirely cut off from the outside world was distressing.

182.185.  He was unable to explain to his boss that he was (literally) tied up and unable to come to work, through no fault of his own.

183.186.  He lost wages from the shifts he missed while detained.

184.187.  Because he was a "no call, no show" to his assigned shifts, George's employer prohibited him from returning to work for a while, during which time he lost wages from shifts he would have worked.

185.188.  His reputation as a valued employee was diminished.

186.189.  The physically and psychologically traumatic experience exacerbated injuries George sustained in the military: herniated disks in his neck and post-traumatic-stress disorder.

187.190.  George missed priceless time and events with his family, including his daughter's third birthday party.

## CLAIMS

188.191.  George asserts various claims based on Defendants' violations of his Fourth and Fifth Amendment rights. The next two subsections outline those constitutional violations. The first seven causes of action asserted after that seek to remedy the constitutional violations. George also asserts claims against the

18

First Amended Complaint for
Declaratory Relief and Damages

United States for its officers' tortious conduct.

189.192. The Westfall Act, 28 U.S.C. § 2679(b), states that the Federal Tort Claims Act supplies an exclusive remedy for certain acts or omissions of federal employees acting within the scope of their offices or employment but that remedy does *not* preclude other remedies in "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States."

190.193. Traditionally, state-law torts have supplied remedies for constitutional violations by federal officers. Other avenues for redress for constitutional violations may be found in California's Civil Rights Act; the federal Constitution, itself; and the Westfall Act of 1988.

191.194. George thus asserts a claim against the United States under the Federal Tort Claims Act for federal employees' tortious conduct (Count 8, below), and he also asserts claims for the employees' violations of the U.S. Constitution: claims under California's Tom Bane Civil Rights Act (Count 1), state-law tort claims that have traditionally remedied constitutional violations by federal officers (Counts 2–5), claims directly under the U.S. Constitution (Count 6), and claims under the Westfall Act (Count 7).

192.195. If the Westfall Act precludes all recovery for the tortious and unconstitutional acts of John Does, then the Westfall Act is unconstitutional as applied to George, and George is entitled to proceed against the individual John Does on his state-law counts directly (Counts 1–5).

### A. Fourth Amendment violations: unreasonable searches and seizures

193.196. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

194.197. A search or seizure of persons, houses, papers, or effects violates the Fourth Amendment when the search or seizure is unsupported by probable

19

First Amended Complaint for
Declaratory Relief and Damages

cause and unsupported by a warrant, or when the search or seizure is carried out in an unreasonable way.

198. John Does who kept George detained and who transported him to and/or were at the Navy base violated George's Fourth Amendment rights.

199. They carried out unreasonable searches of George by fingerprinting him and taking a DNA sample from his cheek with neither a warrant nor probable cause to believe he had committed a crime.

200. They also unreasonably prolonged George's detention by keeping him detained, transporting him to the base, cuffing his hands and shackling his legs, and prolonging his detention without a legitimate basis.

201. John Does who transported George to and were at the Metropolitan Detention Center also violated George's Fourth Amendment rights.

202. They prolonged his detention without a legitimate basis by transporting him to the Metropolitan Detention Center.

203. They strip-searched him.

204. They seized his belongings.

205. They did not allow him to shower to clean the chemical irritants off his skin.

206. They did not allow him to make a phone call.

207. They did not give him access to an attorney.

208. They denied him a prompt hearing with a judge following his warrantless arrest.

209. John Does who violated George's Fourth Amendment rights include officers with the Federal Bureau of Prisons, the Department of Homeland Security (including Immigration and Customs Enforcement and Customs and Border Protection), the Federal Bureau of Investigation, and the Department of the Navy.

210. John Does who violated George's Fourth Amendment rights were

20

First Amended Complaint for
Declaratory Relief and Damages

acting as investigative or law -enforcement officers—that is, as officers of the United States who are empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law.

### B. Fifth Amendment violations: deprivation of liberty and property

208.211. The Due Process clause of the Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

209.212. California law gives pretrial detainees a liberty interest in making at least three completed phone calls immediately upon being booked and, except where physically impossible, no later than three hours after arrest.

210.213. Department of Homeland Security standards entitle many detainees to reasonable and equitable access to telephone services.

211.214. Those standards entitle detainees to make calls to family and an attorney as soon as possible after requesting to call, at least within 24 hours of the request and ordinarily within eight waking hours.

212.215. Those standards also require staff to document and report any incident of delay beyond eight waking hours.

213.216. George was arrested at approximately 2:30 p.m. on Thursday, July 10, 2025.

214.217. He was given no phone call during his entire detention, which lasted until the afternoon of Sunday, July 13, 2025 (approximately 72 hours).

215.218. John Does, including those who work in the Federal Bureau of Prisons;, the Department of Homeland Security, including Immigration and Customs Enforcement and Customs and Border Protection; the Federal Bureau of Investigation; and the Department of the Navy deprived George of access to phone calls during his three-day detention following his arrest.

216.219. In doing so, John Does deprived George of a protected liberty

21

First Amended Complaint for
Declaratory Relief and Damages

interest without due process of law.[3]

217.220.John Does also deprived George of physical liberty and property when they continued to detain him and took his personal belongings away, with neither probable cause nor a warrant.

218.221.John Does arbitrarily prolonged George's detention simply because he was in the vicinity of an immigration raid and had addressed officers about them blocking his path to get to work.

219.222.George was arbitrarily subjected to a prolonged detention, and his personal property was taken, because Defendants lacked procedures to adequately ensure that innocent people are freed once officials realize (or should realize) that they lack a legitimate basis to hold them.

220.223.John Does knew or should have known that George's continued detention was baseless given information that was readily available to them.

221.224.John Does also deprived George of due process by depriving him of a hearing with a judge for his entire detention lasting approximately 72 hours.

222.225.John Does' indifference to George's innocence and the circumstances surrounding his arrest violated his right to due process.

### C. Causes of action

**Count 1**

**Tom Bane Civil Rights Act:**

**Fourth and Fifth Amendment Violations**

***Against John Doe Defendants***

223.226. George realleges and incorporates the allegations in paragraphs 1 through 222225.

224.227. California's Tom Bane Civil Rights Act, Cal. Civ. Code § 52.1, provides a cause of action against "a person or persons, whether or not acting

---

[3] This denial of access to a phone call also violated George's First Amendment rights.

22

First Amended Complaint for
Declaratory Relief and Damages

under color of law," who "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state."

225.228. John Does, by coercion, intentionally interfered with George's enjoyment of his Fourth Amendment rights.

226.229. They intentionally prolonged his detention arbitrarily, without any legitimate basis.

227.230. They intentionally deprived him of a shower.

228.231. They intentionally deprived him of all phone calls.

229.232. They intentionally deprived him of access to an attorney.

230.233. They intentionally deprived him of a hearing with a judge.

231.234. John Does, by coercion, intentionally interfered with George's Fifth Amendment rights.

232.235. They intentionally deprived him of all phone calls for approximately 72 hours.

233.236. They intentionally deprived him of a hearing with a judge for his entire three-day detention.

234.237. As a result of John Does' conduct, George suffered the injuries listed above.

235.238. George is entitled to nominal, compensatory, and exemplary damages for his injuries caused by John Does' conduct.

### Count 2

### Trespass to Chattels

### *Against John Doe Defendants*

236.239. George realleges and incorporates the allegations in paragraphs 1 through 222225.

23

First Amended Complaint for
Declaratory Relief and Damages

237.240. The unreasonable seizure of George's property also amounts to trespass to chattels under California law.

238.241. Without legal authority, John Does intentionally interfered with George's possession of his personal property, and depriving him of his vehicle and personal artifacts during his detention.

239.242. John Does demonstrated willful and conscious disregard for George's rights and safety.

240.243. As a result of John Does' tortious conduct, George suffered the injuries listed above, including discomfort from being stripped of his clothing, lost wages from being unable to report to work, and trauma from being unable to contact anyone with his phone.

241.244. George is entitled to nominal, compensatory, and punitive damages for his injuries caused by John Does' unconstitutional and tortious conduct.

### Count 3

### Assault and Battery

### *Against John Doe Defendants*

242.245. George realleges and incorporates the allegations in paragraphs 1 through 222225.

243.246. The unconstitutional searches and seizure of George by John Does amount also to assault and battery under California law.

244.247. Without legal authority, John Does intended to cause harmful or offensive contact with George—cuffing his hands and shackling his legs, fingerprinting him and taking a DNA sample from inside his mouth, strip-searching him, and locking him in cells.

245.248. George did not consent to John Does' conduct, which would have been offensive to any reasonable person.

24

First Amended Complaint for
Declaratory Relief and Damages

246.249. John Does demonstrated willful and conscious disregard for George's rights and safety.

247.250. As a result of John Does' tortious conduct, George suffered the injuries listed above.

248.251. George is entitled to nominal, compensatory, and punitive damages for his injuries caused by John Does' unconstitutional and tortious conduct.

### Count 4

### False Imprisonment and False Arrest

### *Against John Doe Defendants*

249.252. George realleges and incorporates the allegations in paragraphs 1 through 222225.

250.253. The unconstitutional seizure of George, and the deprivation of his rights to make phone calls and to have a prompt hearing, by John Does also amount to false imprisonment and false arrest under California law.

251.254. Without legal authority, John Does intentionally prolonged George's his detention, ultimately causing him to be confineding him to jail cells.

252.255. Without legal authority, John Does intentionally deprived George of a prompt hearing with a judge within 48 hours of his arrest.

253.256. Without legal authority, John Does intentionally denied George use of a phone, using physical force and physical barriers.

254.257. George did not consent to John Does' conduct, which would have been offensive to any reasonable person.

255.258. John Does demonstrated willful and conscious disregard for George's rights and safety.

256.259. As a result of John Does' tortious conduct, George suffered the injuries listed above.

25

First Amended Complaint for
Declaratory Relief and Damages

257.260. George is entitled to nominal, compensatory, and punitive damages for his injuries caused by John Does' unconstitutional and tortious conduct.

## Count 5

### Negligence

#### *Against John Doe Defendants*

258.261. George realleges and incorporates the allegations in paragraphs 1 through 222225.

259.262. The unconstitutional treatment of George by John Does also amounts to negligence under California law.

260.263. John Does had a legal duty to use reasonable, due care to continue detaining an individual only when John Does had probable cause to believe that person has committed a crime.

261.264. John Does also had a legal duty to use reasonable, due care to search an individual (with fingerprints, a DNA sample, and a full-body strip search) only when John Does had probable cause to believe the person is detained on allegations of criminal conduct.

262.265. John Does also had a legal duty to exercise reasonable, due care to ensure that detainees receive three phone calls within three hours of their arrest.

263.266. John Does also had a legal duty to exercise reasonable, due care to ensure that detainees have access to an attorney within three hours of their arrest.

264.267. John Does also had a legal duty to exercise reasonable, due care to ensure that detainees receive a probable-cause hearing within forty-eight hours of their arrest.

265.268. John Does breached those legal duties.

266.269. John Does demonstrated willful and conscious disregard for George's rights and safety.

26

First Amended Complaint for
Declaratory Relief and Damages

267.270. As a result of John Does' willful and negligent conduct, George suffered the injuries listed above.

268.271. George is entitled to nominal, compensatory, and punitive damages for his injuries caused by John Does' unconstitutional and tortious conduct.

## Count 6

### Fourth and Fifth Amendment Violations

### *Against John Doe Defendants*

269.272. George realleges and incorporates the allegations in paragraphs 1 through 222225.

270.273. John Does are liable directly under the Fourth and Fifth Amendments for their violations of George's Fourth and Fifth Amendment rights.

271.274. At least some John Does were rank-and-file law -enforcement officers.

272.275. John Does prolonged George's detention and searched George him with neither probable cause nor a warrant.

273.276. They also deprived him of a phone call.

274.277. They deprived him of access to an attorney.

275.278. They deprived him of a shower.

276.279. They deprived him of a hearing.

277.280. John Does arbitrarily deprived George of physical liberty.

278.281. They arbitrarily deprived him of property.

279.282. They arbitrarily deprived him of his liberty right to three phone calls during his detention.

280.283. John Does were not enforcing immigration laws, carrying out border-patrol activities, or addressing a risk to national security.

281.284. As a direct result of John Does' Fifth Amendment violations, George suffered the injuries listed above.

27

First Amended Complaint for
Declaratory Relief and Damages

282.285. George is entitled to compensatory damages for his injuries caused by John Does' unconstitutional conduct.

## Count 7

### Westfall Act:

### Fourth and Fifth Amendment Violations

### *Against John Doe Defendants*

283.286. George realleges and incorporates the allegations in paragraphs 1 through 222225.

284.287. When enacting the Westfall Act, 28 U.S.C. § 2679(b)(2)(A), Congress endorsed two kinds of claims seeking redress for constitutional violations: *Bivens* claims and traditional state-law remedies.

285.288. In this way, Congress codified the availability of *Bivens* claims as that avenue for relief existed in 1988, when the Westfall Act was enacted.

286.289. In 1988, *Bivens* generally provided an avenue for relief against federal officers for violations of Fourth and Fifth Amendment rights.

287.290. John Does violated George's Fourth and Fifth Amendment rights as detailed above.

288.291. As a direct result, George suffered the injuries listed above.

289.292. George is entitled to compensatory damages for John Does' constitutional violations under 28 U.S.C. § 2679(b)(2)(A).

## Count 8

### Federal Tort Claims Act

### *Against Defendant United States of America*

290.293. George realleges and incorporates the allegations in paragraphs 1 through 222225.

291.294. At all times relative to this count, John Does with the Federal Bureau of Prisons were acting under color of law and within the scope of their

28

First Amended Complaint for
Declaratory Relief and Damages

offices or employment as agents of the ~~Federal Bureau of Prisons~~United States government.

292.295. At least some~~ll those~~ John Does were also acting as investigative or law_-enforcement officers—that is, as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law.

293.296. As described above, the acts and omissions of John Does acting within the scope of their offices or employment with the ~~Federal Bureau of Prisons~~United States government amount to multiple torts recognized by California law, including:

    a.   trespass to chattels;

    b.   assault;

    c.   battery;

    d.   false imprisonment and false arrest; and

    e.   negligence.

294.297. A private person would be liable to George under like circumstances for torts under the laws of California.

295.298. As a direct result of ~~these~~ John Does' actions, George suffered the injuries listed above.

296.299. Defendant United States of America is thus liable under the Federal Tort Claims Act for the acts and omissions of John Does acting within the scope of their offices or employment with the ~~Federal Bureau of Prisons~~United States government.

29

First Amended Complaint for
Declaratory Relief and Damages

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief as follows:

A. An award of nominal, compensatory, and punitive or exemplary damages against John Doe Defendants, for their tortious and unconstitutional acts and omissions.

B. An award of nominal and compensatory damages against Defendant United States of America, for the tortious and unconstitutional acts and omissions of its agents ~~in the Federal Bureau of Prisons~~.

C. A declaration that George's rights under California ~~tort~~ law and the Fourth and Fifth Amendments have been violated.

D. An award of reasonable attorney's fees and costs against the United States. *See* 28 U.S.C. § 2412.

E. All further legal and equitable relief as the Court deems just and proper.

Dated: ~~February 18~~June 12, 2026

/s/ Marie Miller

Marie Miller* (IN Bar No. 34591-53)
mmiller@ij.org
INSTITUTE FOR JUSTICE
3200 N. Central Ave., Ste. 2160
Phoenix, AZ 85012
480-557-8300

Patrick Jaicomo* (MI Bar No. P-75705)
pjaicomo@ij.org
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, VA 22203
703-682-9320

* ~~Applications for admission~~Admitted
pro hac vice ~~forthcoming~~

*Counsel for Plaintiff*

~~/s/ Anna M. Barvir~~

Anna M. Barvir (Bar No. 268728)
ABarvir@michellawyers.com
Joshua Robert Dale (Bar No. 209942)
JDale@michellawyers.com
Michel & Associates, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
562-216-4444

*Local Counsel for Plaintiff*

30

First Amended Complaint for
Declaratory Relief and Damages